# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

FAIRFIELD SENTRY LIMITED

                          Plaintiff,

-vs-

FAIRFIELD GREENWICH GROUP, FAIRFIELD
GREENWICH (BERMUDA) LIMITED, FAIRFIELD
GREENWICH ADVISORS, LLC, FAIRFIELD
GREENWICH LIMITED, FAIRFIELD
INTERNATIONAL MANAGERS, INC., WALTER
M. NOEL, JR., JEFFREY TUCKER, ANDRES
PIEDRAHITA, AMIT VIJAYVERGIYA, BRIAN
FRANCOUER, LOURDES BARRENCHE,
CORNELIS BOELE, PHILIP TOUB, RICHARD
LANDSBERGER, CHARLES MURPHY, ANDREW
SMITH, DANIEL LIPTON, MARK MCKEEFRY,
HAROLD GREISMAN, SANTIAGO REYES,
JACQUELINE HARARY, ROBERT BLUM,
CORINA NOEL PIEDRAHITA, MARIA TERESA
PULIDO MENDOZA, and JOHN DOES 1-20

                         Defendants.

Index No. _____

Date Purchased _____

Plaintiff Designates New York
County as the place of trial.

The basis of venue is the residence
of at least one of the parties.

**SUMMONS**



To:    The Above-Named Defendants

        YOU ARE HEREBY SUMMONED to answer the complaint in this action, and to serve a copy of your answer on the attorneys for plaintiff within **twenty (20) days** after the service of this summons exclusive of the day of service (or within thirty (30) days of the completion of service where service is made in any other manner than personal delivery within New York State); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

New York County is designated as the basis of venue pursuant to CPLR

§§503(a),(c) because at least one of the Defendants resides in New York County.


New York, New York
May 29, 2009

SEWARD & KISSEL LLP

Michael J. McNamara
Jack Yoskowitz
Walter A. Naeder

One Battery Park Plaza
New York, New York 10004
(212) 574-1200
Attorneys for Plaintiff Fairfield Sentry Limited


Defendants' Addresses:

**See Attached Schedule A**

SK 25528 0043 999757

2

Supreme Court Records OnLine Library -  page 2 of 72

# Schedule A

FAIRFIELD GREENWICH GROUP
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

FAIRFIELD GREENWICH (BERMUDA) LIMITED
Suite 606
12 Church Street
Hamilton, Bermuda HM11

FAIRFIELD GREENWICH ADVISORS, LLC,
919 Third Avenue
New York, New York 10022

FAIRFIELD GREENWICH LIMITED,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

FAIRFIELD INTERNATIONAL MANAGERS, INC.,
Fairfield International Managers, Inc.
2 Soundview Drive
Greenwich, CT 06830

WALTER M. NOEL, JR.,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

JEFFREY TUCKER,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

ANDRES PIEDRAHITA,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

AMIT VIJAYVERGIYA,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

BRIAN FRANCOUER,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

LOURDES BARRENCHE,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

3

Supreme Court Records OnLine Library -  page 3 of 72

CORNELIS BOELE,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

PHILIP TOUB,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

RICHARD LANDSBERGER,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

CHARLES MURPHY,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

ANDREW SMITH,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

DANIEL LIPTON,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

MARK MCKEEFRY,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

HAROLD GREISMAN,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

SANTIAGO REYES,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

JACQUELINE HARARY,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

ROBERT BLUM,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

4

CORINA NOEL PIEDRAHITA,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

MARIA TERESA PULIDO MENDOZA
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

JOHN DOES 1-20
Addresses Unknown

5

Supreme Court Records OnLine Library - page 5 of 72

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| FAIRFIELD SENTRY LIMITED | Index No. _____ |
| Plaintiff, | |
| -vs- | |
| FAIRFIELD GREENWICH GROUP, FAIRFIELD GREENWICH (BERMUDA) LIMITED, FAIRFIELD GREENWICH ADVISORS, LLC, FAIRFIELD GREENWICH LIMITED, FAIRFIELD INTERNATIONAL MANAGERS, INC., WALTER M. NOEL, JR., JEFFREY TUCKER, ANDRES PIEDRAHITA, AMIT VIJAYVERGIYA, BRIAN FRANCOUER, LOURDES BARRENCHE, CORNELIS BOELE, PHILIP TOUB, RICHARD LANDSBERGER, CHARLES MURPHY, ANDREW SMITH, DANIEL LIPTON, MARK MCKEEFRY, HAROLD GREISMAN, SANTIAGO REYES, JACQUELINE HARARY, ROBERT BLUM, CORINA NOEL PIEDRAHITA, MARIA TERESA PULIDO MENDOZA, and JOHN DOES 1-20 | **VERIFIED COMPLAINT**  0 9 6 0 1 6 8 7  **TRIAL BY JURY DEMANDED** |
| Defendants. | |



Plaintiff Fairfield Sentry Limited (the "Fund"), by its attorneys, Seward & Kissel

LLP, as and for its Verified Complaint against Defendants, alleges as follows:

The factual allegations herein are based upon the Fund's personal knowledge and

business records, and information obtained during the course of the investigation by its counsel,

including a review of pleadings and exhibits filed by government authorities, including the plea

allocution of Bernard L. Madoff, Defendants' business records, and the findings of Irving Picard,

Esq., the court-appointed Bankruptcy Trustee presiding over the liquidation of Bernard L.

Madoff Investment Securities LLC ("BLMIS").

## NATURE OF THE ACTION

1.     The Fund, the largest victim of the fraud perpetrated by Bernard L. Madoff ("Madoff"), brings this action to recover, among other things, in excess of $919 million in investment management and performance fees that the Fund paid Defendants based on inflated net asset value reports derived from the Fund's investments with BLMIS and C&M Trading ("CMT").

2.     The Fund sought to obtain capital appreciation of its assets through investing with Madoff in his "split strike conversion" strategy, which supposedly entailed, from time to time, the purchase and selling of (a) baskets of equity securities that were intended to correlate to the S&P 100 index, and (b) put and call option contracts with a notional value that approximately equaled the market value of the baskets of securities. Subject to certain guidelines and restrictions prepared by the Fairfield Entity Defendants, as defined below, CMT and BLMIS were supposed to have implemented the "split strike conversion" strategy. The Fund's investments with Madoff are referred hereinafter as the "SSC Investments."

3.     The Fund is in direct privity with a number of the Fairfield Entity Defendants, which served, *inter alia*, as the Fund's investment adviser and risk manager from November 1990 through May 29, 2009. In connection therewith, the Fairfield Entity Defendants had fiduciary and contractual obligations to use their best efforts to perform the Fund's day-to-day investment activities, and to supervise the activities of Madoff, BLMIS and CMT. Specifically, the Fairfield Entity Defendants had an obligation to independently verify and examine the existence of trade and option hedging transactions reflected in the account statements and trade tickets that the Fairfield Entity Defendants received from Madoff. While the Fund is aware that other lawsuits have been brought against some or all of the Defendants,

2

the Fund believes it is in the best position to bring this action and has standing to assert direct claims against Defendants.

4.    In consideration for their services, the Fairfield Entity Defendants received: (a) starting in May 2004, a fixed monthly management fee in an amount equal to 1%, per annum, of the Fund's Net Asset Value (as further described below), and (b) from inception, a quarterly performance fee in an amount equal to 20% of the net appreciation of the Fund's Net Asset Value (as further described below).

5.    The Fairfield Entity Defendants recorded the Fund's Net Asset Value and appreciation on certain reports and performance sheets (the "Net Asset Value Reports") based on information received from Madoff. During the period 2002 to 2008 alone, the Fund paid $919,476,832 in management and performance fees based on the Net Asset Value Reports prepared by, or prepared under the supervision of, the Fairfield Entity Defendants.

6.    As the world now knows, Madoff was arrested on December 11, 2008 on criminal charges that he violated federal securities laws by operating a multi-billion dollar "Ponzi" scheme. Upon arrest, Madoff told FBI agents that there was no innocent explanation for his crimes. Consequently, the Fund lost approximately $7.0 billion, which was invested with Madoff as of December 11, 2008.

7.    On March 10, 2009, the United States Attorney for the Southern District of New York filed a criminal Information against Madoff, which alleged that, among other things, "Madoff failed to honor his promises to BLMIS clients by, among other things, failing to invest the BLMIS investment advisory clients' funds in securities as he promised." See United States v. Madoff, 09-CR-213, Docket No. 38 (Information ¶5). Further, Madoff "created and caused to be created a broad infrastructure at BLMIS to generate the impression and support the appearance that BLMIS was operating a legitimate investment advisory business in which client

3

funds were actively traded as he promised, and to conceal the fact that no such business was actually being conducted." Id. ¶ 10. Moreover, Madoff caused "BLMIS employees to, among other things, communicate with clients and generate false and fraudulent documents including, but not limited to, monthly account statements and trade confirmations that purportedly reflected the purchases and sales of securities that Madoff claimed had been conducted on behalf of BLMIS's clients." Id.

   8. On March 12, 2009, in his plea allocution, Madoff admitted, among other things, that (a) his "fraud began in the early 1990s," (b) he "misrepresented to clients, employees and others, that [he] purchased securities for clients in overseas markets," (c) he never "executed trades on behalf of [his] investment advisory clients," and (d) he falsified "trading confirmations and client account statements that reflected the bogus transactions and positions [he] created and sent to clients purportedly involved in the split strike conversion strategy." See United States v. Madoff, 09-CR-213 (S.D.N.Y), Docket No. 50 at 2-3.

   9. On March 12, 2009, Madoff waived indictment and pled guilty to all 11 counts in the Information, namely (a) securities fraud, (b) Investment Adviser fraud, (c) mail fraud, (d) wire fraud, (e) international money laundering to promote unlawful activity, (f) international money laundering to conceal and disguise the proceeds of unlawful activity, (g) money laundering, (h) false statements to the government authorities, (i) perjury, (j) false filing with the SEC, and (k) theft from employee benefit plan. See United States v. Madoff, 09-CR-213, Docket No. 50.

   10. Madoff's admissions contradict the Net Asset Value Reports and other financial information that the Fairfield Entity Defendants prepared and provided to the Fund concerning the value of the SSC Investments. Accordingly, from the outset of its relationship with Defendants, the Fund paid, and Defendants received, hundreds of millions of dollars in the

4

form of management and performance fees based on inflated Net Asset Value Reports. Defendants must return these management and performance fees to the Fund.

11.     Based on the foregoing, Defendants have been unjustly enriched and the Fairfield Entity Defendants have violated their contractual obligations, fiduciary duties and duties of due care to, *inter alia*, supervise and conduct due diligence on Madoff, and independently verify the source of information of the Net Asset Value Reports – *i.e.*, the existence of trades and option contracts as reflected in the BLMIS and CMT trade tickets and account statements. Defendants owe restitution, with interest, to the Fund, together with other damages and relief as described below.

## PARTIES

12.     The Fund is a company duly incorporated on October 30, 1990 under the International Business Companies Act of the British Virgin Islands, automatically re-registered on January 1, 2007 as a business company under the BVI Business Companies Act of 2004 of the British Virgin Islands, and recognized as a professional fund under the 1996 Mutual Funds Act of the British Virgin Islands. The Fund's principal place of business is in the British Virgin Islands. The Fund commenced operations on December 1, 1990.

The Fairfield Entity Defendants

13.     Defendant Fairfield Greenwich Group ("FGG") was founded in 1983 and is a de facto partnership or partnership by estoppel. FGG claims to be an experienced alternative asset manager and an independent employee-owned firm with 23 partners. As of October 2008, FGG claimed to have $16 billion of assets under management -- $7.3 billion of which was purportedly in the Fund and the rest in various other investment funds. FGG's principal place of business is in New York and maintains an office at 919 Third Avenue, New York, New York 10022.

5

14.     Defendant Fairfield Greenwich Limited ("FGL") is a company incorporated and existing under the laws of the Cayman Islands. From at least December 31, 2001 to July 1, 2003, FGL served as the Fund's investment and risk manager pursuant to an investment management agreement, under which it was compensated in the form of management and performance fees. From July 1, 2003 to December 11, 2008, FGL was compensated as the Fund's placement agent in connection with the offering of the Fund's shares pursuant to private placement memoranda. Further, as the parent company of Fairfield Greenwich (Bermuda) Ltd., FGL has also received a portion of investment and performance fees paid to FGBL (as defined below) since July 2003. FGL is registered as a foreign company authorized to conduct business in New York County. FGL maintains an office in New York.

15.     Defendant Fairfield Greenwich (Bermuda) Ltd. ("FGBL") is a company incorporated and existing under the laws of Bermuda with its principal place of business at 12 Church Street, Suite 606, Hamilton, Bermuda, HM 11. FGBL is affiliated with FGG and is a wholly owned subsidiary of FGL. From at least July 1, 2003 to December 11, 2008, FGBL was the Fund's investment and risk adviser pursuant to an investment management agreement, under which it was paid management and performance fees. FGBL conducts business in New York and certain of its employees are based in New York.

16.     Defendant Fairfield Greenwich Advisors LLC ("FGA") is a limited liability company organized under the laws of the State of Delaware and it is registered to do business in New York. FGL is the sole member and owner of FGA. From at least July 1, 2003 to December 11, 2008, pursuant to investment management agreements, FGA received a percentage of the management fee paid to FGBL for bearing certain of the Fund's internal and operational expenses. FGA's principal place of business is in New York.

6

17.     Fairfield International Managers, Inc. ("FIM") is a company organized in Delaware. FIM served as the Fund's initial investment manager starting in November 1990 under an investment management agreement. FIM is an owner of FGL. As an owner of FGL, and as the Fund's previous investment and risk manager, FIM has been paid management and performance fees on the SSC Investments. FIM conducts business in New York.

18.     FGG, FGL, FGBL, FGA, and FIM are referred herein as the "Fairfield Entity Defendants."

<u>The Fairfield Controlling Partner Defendants</u>

19.     Defendant Walter M. Noel, Jr. ("Noel") is a founding partner of FGG and serves on the Fund's Board of Directors. Based on Defendants' business records, Noel is a principal and/or controlling person of the Fairfield Entity Defendants and has an equity share of FGG and/or investment funds managed by FGG. Accordingly, Noel has received a percentage of the management and performance fees paid to the Fairfield Entity Defendants, and he is liable to the Fund in his capacity as a principal and/or controlling person of the Fairfield Entity Defendants. Noel maintains a residence in New York and conducts business in New York.

20.     Defendant Jeffrey Tucker ("Tucker") is a founding partner of FGG and oversees FGG's business operations. Based on Defendants' business records, Tucker is a principal and/or controlling person of the Fairfield Entity Defendants and has an equity share of FGG and/or investment funds managed by FGG. Accordingly, Tucker has received a percentage of the management and performance fees paid to the Fairfield Entity Defendants. Tucker maintains a residence in New York and conducts business in New York.

21.     Defendant Andres Piedrahita ("Piedrahita") is a controlling partner of FGG and serves as the President and Director of FGBL. Based on Defendants' business records, Piedrahita is a controlling person and/or owner of the Fairfield Entity Defendants and has an

7

equity share of FGG and/or investment funds managed by FGG. Accordingly, Piedrahita has received a percentage of the management and performance fees paid to the Fairfield Entity Defendants. Piedrahita conducts business in New York.

22.     Noel, Tucker and Piedrahita are herein referred as the "Fairfield Controlling Partner Defendants."

The Fairfield Partner Defendants

23.     Defendant Amit Vijayvergiya ("Vijayvergiya") is a citizen of Canada. Vijayvergiya is the Managing Director and Chief Risk Officer of FGBL. Vijayvergiya joined FGBL in 2003 and was responsible for the Fund's risk management. Based on Defendants' business records, Vijayvergiya has an equity share of FGG and/or investment funds managed by FGG. Accordingly, Vijayvergiya has received a share of the management and performance fees paid to the Fairfield Entity Defendants. Vijayvergiya conducted business in New York.

24.     Brian Francouer ("Francouer") is a Director of FGBL. In connection therewith, on information and belief, Francouer has received a share of the management and performance fees paid to FGBL, and he has conducted business in New York.

25.     Lourdes Barranche ("Barrenche") is a partner in FGG. According to Defendants' business records, Barrenche has been with FGG since 1997, she is an international sales specialist and has marketed FGG's investment funds. Barranche has an equity share of FGG and/or investment funds managed by FGG. Accordingly, Barranche has received a share of the management and performance fees paid to the Fairfield Entity Defendants. Barranche is based in FGG's New York office.

26.     Cornelis Boele ("Boele") is a partner in FGG. According to Defendants' business records, Boele has been with FGG since 1997 and oversees the marketing efforts of the offshore funds of FGG in the Benelux region and markets throughout Europe. Boele has an

8

equity share of FGG and/or investment funds managed by FGG. Accordingly, Boele has received a share of the management and performance fees paid to the Fairfield Entity Defendants. Boele is based in FGG's New York office.

27. Philip Toub ("Toub") is a partner in FGG. According to Defendants' business records, Toub has been with FGG since 1997 and is a member of FGG's Executive Committee. Toub markets FGG's offshore funds and assists in the development of new products. Toub has an equity share of FGG and/or investment funds managed by FGG. Accordingly, Toub has received a share of the management and performance fees paid to the Fairfield Entity Defendants. Toub is based in FGG's New York office.

28. Richard Landsberger ("Landsberger") is a partner in FGG. According to Defendants' business records, Landsberger joined FGG in 2001 and he is a member of FGG's Executive Committee. Landsberger is responsible for business development and general management issues in Europe and Asia and directly markets products to FGG's global institutional client base. Landsberger has an equity share of FGG and/or investment funds managed by FGG. Accordingly, Landsberger has received a share of the management and performance fees paid to the Fairfield Entity Defendants. Landsberger is based in FGG's London office. On information and belief, Landsberger conducts business in New York.

29. Charles Murphy ("Murphy") is a partner in FGG. On information and belief, Murphy joined FGG in 2007. According to Defendants' business records, Murphy is a member of FGG's Executive Committee and is responsible for strategy and capital markets business for FGG. Murphy has an equity share of FGG and/or investment funds managed by FGG. Accordingly, Murphy has received a share of the management and performance fees paid to the Fairfield Entity Defendants. Murphy is based in FGG's New York office.

9

Supreme Court Records OnLine Library - page 14 of 72

30.     Daniel Lipton ("Lipton") is a partner in FGG.  According to Defendants'
business records, Lipton joined FGG in 2002 and he serves as its Chief Financial Officer.  Lipton
was involved in preparing the Fund's financial statements and Net Asset Value Reports.  Lipton
has an equity share of FGG and/or investment funds managed by FGG.  Accordingly, Lipton has
received a share of the management and performance fees paid to the Fairfield Entity
Defendants.  Lipton is based in FGG's New York office.

31.     Mark McKeefry ("McKeefry") is a partner in FGG.  According to
Defendants' business records, McKeefry joined FGG in 2003 and he serves as its Chief
Operating Officer and General Counsel.  McKeefry has an equity share of FGG and/or
investment funds managed by FGG.  Accordingly, McKeefry has received a share of the
management and performance fees paid to the Fairfield Entity Defendants.  McKeefry is based in
FGG's New York office.

32.     Harold Greisman ("Greisman") is a partner in FGG.  According to
Defendants' business records, Greisman joined FGG in 1990 and he evaluates alternative asset
investments and managers.  Greisman has an equity share of FGG and/or investment funds
managed by FGG.  Accordingly, Greisman has received a share of the management and
performance fees paid to the Fairfield Entity Defendants.  Greisman is based in FGG's New
York and London offices.

33.     Santiago Reyes ("Reyes") is a partner in FGG.  According to Defendants'
business records, Reyes joined FGG in 1996 and is head of FGG's Miami office.  Reyes markets
FGG's offshore funds worldwide.  Reyes has an equity share of FGG and/or investment funds
managed by FGG.  Accordingly, Reyes has received a share of the management and performance
fees paid to the Fairfield Entity Defendants.  On information and belief, Reyes conducts business
in New York.

10

Supreme Court Records OnLine Library - page 15 of 72

34.     Jacqueline Harary ("Harary") is a partner in FGG. According to Defendants' business records, Harary markets FGG's funds worldwide and is involved with selection of investment managers and product development. Harary joined FGG in 1997 and has an equity share of FGG and/or investment funds managed by FGG. Accordingly, Harary has received a share of the management and performance fees paid to the Fairfield Entity Defendants. Harary is based in FGG's New York office.

35.     Robert Blum ("Blum") was a Managing Partner and Chief Operating Officer of FGG from 2000 to 2005. According to Defendants' business records, Blum continues to share in the profits of FGG and/or investment funds managed by FGG. Accordingly, Blum has received a share of the management and performance fees paid to the Fairfield Entity Defendants. Blum was based in FGG's New York office.

36.     Corina Noel Piedrahita ("Corina Piedrahita") is a partner in FGG. According to Defendants' business records, Corina Piedrahita markets FGG's funds and has an equity share of FGG and/or investment funds managed by FGG. Accordingly, Corina Piedrahita has received a share of the management and performance fees paid to the Fairfield Entity Defendants. Corina Piedrahita conducts business in New York.

37.     Maria Teresa Pulido Mendoza ("Mendoza") is a partner in FGG. On information and belief, Mendoza is head of FGG's global sales and is based in New York. According to Defendants' business records, Mendoza has an equity share of FGG and/or investment funds managed by FGG, and she has received a share of the management and performance fees paid to the Fairfield Entity Defendants.

38.     John Does 1-20 are unknown partners, officers or employees of FGG who received a share of the management and performance fees paid to the Fairfield Entity Defendants.

11

Supreme Court Records OnLine Library - page 16 of 72

39.     The FGG partners referred in paragraphs 23 through 37 are hereinafter referred as the "Fairfield Partner Defendants," and with the exception of Vijayvergiya, are named here because they received management and performance fees, which were based on inflated Net Asset Value Reports prepared by, or prepared under the supervision of, the Fairfield Entity Defendants.

40.     On information and belief, according to testimony given to the Commonwealth of Massachusetts Office of the Secretary of the Commonwealth Securities Division (the "Securities Division"), and as alleged in the Securities Division's securities fraud administrative complaint against FGA and FGBL (the "Securities Division Complaint"), filed on April 1, 2009, Tucker, Vijayvergiya and Lipton were the three individuals most directly responsible for conducting due diligence on Madoff and BLMIS.

41.     According to FGG's business records and his testimony to the Securities Division, Noel focused on marketing activities and was not involved in conducting due diligence on Madoff and BLMIS.  Securities Division Complaint at p. 18.

## JURISDICTION AND VENUE

42.     Defendants are subject to personal jurisdiction under CPLR §§ 301 and 302.  Defendants either reside, conduct, or conducted business, within the State.  Further, FGG, FGA and FGL maintain their principal place of business in New York.

43.     Venue is proper in this county pursuant to CPLR § 503(a) and (c), and § 509.

12

## BACKGROUND

### The Fund's Investment Objective

44.     The Fund sold shares to qualified, experienced and sophisticated investors ("Shareholders") through a private placement memorandum, as amended from time to time, ("PPM") and subscription agreements. On January 12, 1995, the Fund's shares were listed on the Irish Stock Exchange in Dublin, Ireland.

45.     From its inception in or about December 1990, the Fund sought to appreciate its assets almost exclusively through the SSC Investments. Accordingly, the Fund entered into certain customer agreements with Madoff and opened limited discretionary brokerage accounts with CMT and BLMIS.

46.     Subject to certain trading authorization directives and option agreements, Madoff was authorized to determine the price and timing of stock and option transactions suitable for the SSC Investments.

47.     As of December 11, 2008, approximately 99% of the Fund's assets were allocated to the SSC Investments. Under the investment management agreements, the Fairfield Entity Defendants had wide discretion as to the allocation of the Fund's investments.

### The Fairfield Entity Defendants Failed to Supervise Madoff

a.     <u>Duty to Exercise "Best Efforts" Under the Investment Management Agreements</u>

48.     FIM was the Fund's first investment manager under an investment management agreement dated November 15, 1990 (the "November 15, 1990 IMA"). Under that agreement, FIM established a brokerage account on behalf of the Fund with CMT, which received an allocation of the Fund's assets for the purpose of trading in equity and options on securities. See November 15, 1990 IMA ¶ 1. The November 15 1990 IMA provided, <u>inter alia,</u> that FIM "*shall use its best efforts to monitor the performance and activities of CMT.*" <u>Id.</u> ¶ 2.

13

(emphasis added). FIM was paid a 20% performance fee on appreciation of the Fund's Net Asset Value from investments with Madoff. Id. ¶ 7. No management fee was charged. The November 15, 1990 IMA provides that it "shall be governed and construed in accordance with the laws of New York." Id. ¶ 8. A copy of the November 15, 1990 IMA is attached as Ex. 1.

49.     On or about October 1, 2002, the Fund and FGL entered into an Amended and Restated Investment Management Agreement, which was in effect until June 30, 2003 (the "October 1, 2002 IMA"). Under that agreement, FGL agreed, among other things, to manage the SSC Investments and use its *"best efforts to monitor the activities and performance of [BLMIS] and any [non-BLMIS] investments."* October 1, 2002 IMA ¶ 2 (emphasis added). The Fund paid FGL a 20% performance fee based on the Fund's net asset appreciation generated from the SSC Investments. Id. at ¶ 7(a). No management fee was charged under the agreement. Id. Like the November 15, 1990 IMA, the October 1, 2002 IMA provided that it shall be construed and governed in accordance with the laws of the State of New York, without regard to the principles of conflicts of laws thereof. Id. ¶ 14. A copy of the October 1, 2002 IMA is attached as Ex. 2.

50.     On October 1, 2004, the Fund executed an Investment Management Agreement with FGBL (the "October 1, 2004 IMA"). The October 1, 2004 IMA superseded an investment management agreement entered into between the Fund and FGBL on July 1, 2003 (the "July 1, 2003 IMA") to reflect the conversion of Class B Shares into Class A Shares and the redesignation of Class A Shares as Shares of the Fund.[1] Prior to October 1, 2004, Class B Shares were charged both a 20% performance fee and a 1% management fee. Class A Shares were charged only the 20% performance fee. Effective October 1, 2004, on the recommendation of the Fairfield Entity Defendants, it was decided that a 1% monthly management fee and a 20%

---

[1]     The October 1, 2004 IMA and July 1, 2003 IMA provide that they shall be construed under the laws of Bermuda.

Supreme Court Records OnLine Library - page 19 of 72

quarterly performance fee shall be charged to all of the Fund's shares. Consequently, the Fairfield Entity Defendants were paid a management fee based on the Fund's assets under management regardless of whether a profit on those assets was realized. Copies of the July 1, 2003 IMA and the October 1, 2004 IMA are attached as Ex. 3 and Ex. 4, respectively.

51. Under the October 1, 2004 IMA, FGBL was required to use "best efforts" to (a) manage the Fund's investment portfolio, (b) oversee the Fund's day-to-day investment operations, (c) act as the Fund's investment adviser, (d) provide information to the Fund and Shareholders, and (e) supervise the activities of BLMIS, the Fund's auditors, PricewaterhouseCoopers LLP ("PricewaterhouseCoopers"), and the Fund's administrator and custodian, Citco Fund Services (Europe) B.V. and Citco Bank Nederland, N.V., Dublin Branch, respectively, and collectively hereinafter referred to as "CITCO." See October 1, 2004 IMA, ¶ 2. Section 2 of the July 1, 2003 IMA mirrors that of the October 1 2004 IMA.

52. By notice dated May 29, 2009, the Fund formally terminated its investment and risk advisory relationship with the Fairfield Entity Defendants.

    b.    <u>Lack of Due Care and Duty to Safeguard the Fund's Assets</u>

53. To determine the Fund's Net Asset Value and net appreciation, BLMIS mailed paper trade tickets and monthly account statements to the Fairfield Entity Defendants and CITCO. The trade tickets and monthly account statements listed the securities and options that Madoff had purportedly purchased and sold on the Fund's account.

54. As investment and risk advisors, a crucial obligation of the Fairfield Entity Defendants was to conduct risk control procedures to safeguard the Fund's assets under the custody of Madoff. As represented to the Fund and Shareholders, the Fairfield Entity Defendants purported to (i) maintain full transparency of the Fund's BLMIS accounts, (ii) independently verify the existence of the Fund's assets and the prices and account values of the

15

BLMIS accounts, and (iii) examine option hedges and conduct risk oversight using certain metrics.

55.     Besides the paper trade tickets and the monthly account statements, the Fairfield Entity Defendants received scant information on the activities of BLMIS with respect to the Fund's account and assets -- in contrast to the Fairfield Entity Defendants' representations that it maintained full transparency of the Fund's BLMIS accounts.

56.     Had the Fairfield Entity Defendants in fact maintained full transparency of the Fund's BLMIS accounts, and had they independently verified the pricing and positions in Madoff's trade tickets and account statements, they would have discovered that no securities, option contracts, or United States Treasury Bills, had been purchased on the Fund's account over the past 18 years.

57.     Given the fact that Madoff and BLMIS did not execute any trades on the account of his investment advisory clients, including the Fund, the Fairfield Entity Defendants failed to fulfill their contractual obligations to use "best efforts" to supervise the operations of BLMIS and oversee the day-to-day investment activities of the Fund.  Moreover, the Fairfield Entity Defendants did not adequately verify the Fund's assets under the custody of Madoff.  Nor did they maintain ongoing transparency with respect to the Fund's accounts with BLMIS.

58.     Accordingly, the Fairfield Entity Defendants recklessly disregarded their duties as the Fund's risk and investment advisor and their actions and inactions constitute gross negligence.

16

**The Fund Paid Performance and Management Fees Based on Inaccurate Information Prepared Under the Fairfield Entity Defendants' Supervision**

59.     Under the October 1, 2004 IMA, FGBL was paid a fixed monthly management fee in an amount equal to one-twelfth of one percent (0.0833%) of the Net Asset Value of the Fund as calculated by CITCO under FGBL's supervision. Net Asset Value was defined, as a general matter, as the Fund's total assets including all cash and cash equivalents, securities positions valued at closing prices, the liquidation value of option positions, less total liabilities of the Fund.

60.     Under all of the investment management agreements, the Fairfield Entity Defendants were paid a quarterly performance fee in an amount equal to 20% of the amount of the net realized and unrealized appreciation in the Fund's Net Asset Value of each Share in such calendar quarter. The Net Asset Value per Share was determined by dividing the Fund's Net Asset Value by the number of Shares then in issue. See The Fund's Memorandum of Association, Articles of Association, ¶ 11. The quarterly performance fee was calculated by CITCO under the Fairfield Entity Defendants' supervision.

61.     FGBL paid FGA a monthly fee in an amount equal to one-fortieth of one percent of the Fund's Net Asset Value for bearing certain of the Fund's internal accounting and operational expenses. See October 1, 2004 IMA ¶ 9

62.     Information relating to the Net Asset Value of the Fund was recorded in the Net Asset Value Reports and in the Fund's unaudited financial statements and audited financial statements. This information was prepared under the Fairfield Entity Defendants' supervision.

63.     Based on the Fund's financial statements for the past 7 years, the Fairfield Entity Defendants received $919,476,832 in management and performance fees:

17

| Year | Performance Fees | Management Fees | Total |
|---|---|---|---|
| Through November 2008 | $97,373,819 | $65,930,013 | $163,303,832 |
| 2007 | $116,257,000 | $67,322,000 | $183,479,000 |
| 2006 | $107,779,000 | $50,465,000 | $158,244,000 |
| 2005 | $87,225,000 | $51,127,000 | $138,352,000 |
| 2004 | $81,278,000 | $21,549,000 | $102,827,000 |
| 2003 | $80,515,000 | $5,221,000 | $85,736,000 |
| 2002 | $83,591,000 | $3,844,000 | $87,435,000 |
| **Total for the above period** | *$654,018,819* | *$265,458,013* | **$919,476,832** |

64.     In addition, under certain deferred fee agreements, the Fairfield Entity Defendants elected to defer certain management and performance fees derived from the SSC Investments, which were recorded on the Fund's financial statements as a liability in the amount of $26 million.

65.     Based on FGG's business records, for 2007 alone, Piedrahita was paid $45.60 million, Tucker was paid $30.67 million, Noel was paid $30.67 million, which amounts were, in part, derived from the fees paid by the Fund on the account of the SSC Investments.

66.     Further, each of the Fairfield Partner Defendants received compensation derived from fees paid by the Fund on the account of the SSC Investments.

**Madoff's Admissions Confirm That the Fund Wrongfully Paid Fees Based On Inflated Net Asset Value Reports And Defendants Were Unjustly Enriched**

67.     On December 11, 2008, Madoff was arrested and charged with running a "Ponzi" scheme in violation of United States securities laws. The SEC also filed a civil

18

complaint in the United States District Court for the Southern District of New York seeking injunctive relief and to have BLMIS placed in receivership. SEC v. Madoff, 08 Civ 1079 (S.D.N.Y).

68.    By Order dated December 15, 2008, Irving Picard, Esq. was appointed the Trustee in charge of presiding over the liquidation of BLMIS under the Securities Investor Protection Act, 15 U.S.C. § 78aaa, et seq. ("SIPA") and the United States Bankruptcy Code.

69.    On February 20, 2009, during a public meeting with customers and creditors of BLMIS held in the United States Bankruptcy Court for the Southern District of New York, the Trustee reported that his investigation had revealed, among other things, that BLMIS had not traded or purchased any securities on the account of any customer, including the Fund, for at least the past 13 years.

70.    Subsequent to his February 20, 2009 report, the Trustee has represented in pleadings with the United States Bankruptcy Court that there are no records of BLMIS having cleared a single purchase or sale of securities at the Depository Trust Company or any other trading platform on which BLMIS could have reasonably traded securities.  Nor has the Trustee found evidence that BLMIS ever purchased or sold any of the options that Madoff claimed to have purchased on customer statements. See e.g., Picard v. Fairfield Sentry Limited, et al., Adv. Proc. No. 09-1239 (BRL) (Docket No. 1, Complaint ¶ 20).

71.    Further, as noted, Madoff has admitted and pled guilty to, among other things, securities fraud violations for (a) not trading on the account of his investment advisory clients and (b) running a ponzi scheme since the 1990s. See supra ¶¶ 7-8.

72.    On March 18, 2009, the SEC charged the auditors of BLMIS, David G. Friehling and his firm, Friehling & Horowitz, CPAs, P.C. ("F&H"), with committing securities fraud by representing that they had conducted legitimate audits, when in fact they had not.

19

According to the SEC, F&H enabled Madoff's Ponzi scheme by falsely stating, in annual audit reports, that F&H had audited the financial statements of BLMIS when in fact, F&H "merely pretended to conduct minimal audit procedures," and "failed to document his purported findings" which would have shown BLMIS owed "tens of billions of dollars in additional liabilities to its customers and was therefore insolvent." See, SEC Charges Madoff Auditors with Fraud, Litigation Release No. 20959 (March 18, 2009).

73.     On March 18, 2009, the United States Attorney for the Southern District of New York charged David G. Friehling, the auditor of BLMIS, with securities fraud, aiding and abetting investment adviser fraud, and four counts of filing false audit reports with the SEC.

74.     In sum, Madoff's admission of guilt reveals that the Net Asset Value Reports contained false information, and the Fund erroneously paid hundreds of million of dollars in the form of management and performance fees to Defendants based on inaccurate information.

## FIRST CLAIM
### *(Breach of Fiduciary Duty and Duty of Care against the Fairfield Entity Defendants; the Fairfield Controlling Partner Defendants; and Vijayvergiya)*

75.     Plaintiff realleges paragraphs 1 through 74.

76.     Independent of the investment management agreements, the Fairfield Entity Defendants owe a fiduciary obligation and a duty of care to the Fund as its investment and risk adviser and agent from November 1990 to May 29, 2009, including a duty to report accurate information concerning the SSC Investments.

77.     In addition, the Fairfield Controlling Partner Defendants and Vijayvergiya owed fiduciary obligations and a duty of care to the Fund by virtue of their positions and roles vis-à-vis the investment and risk operations of the Fund as described and represented in the Fund's private placement memorandum.

20

78.     In connection with the management of its investment portfolio and risk management operations, the Fund reposed confidence on the Fairfield Entity Defendants, the Fairfield Controlling Partner Defendants, and Vijayvergiya, and the Fund reasonably relied on their expertise and knowledge.

79.     The Fairfield Entity Defendants, the Fairfield Controlling Partner Defendants and Vijayvergiya were grossly negligent and recklessly disregarded their fiduciary duties by their conduct and inaction, including, but not limited to:

(a)     Failing to take appropriate steps over the course of 18 years to independently verify that trades on the Fund's accounts were actually executed and option contracts were actually sold and purchased as reflected in the monthly account statements and trade tickets issued by Madoff, BLMIS and CMT;

(b)     Failing to safeguard the Fund's assets in the custody of Madoff, BLMIS, CMT, and conduct risk oversight over Madoff, BLMIS and CMT;

(c)     Failing to perform adequate due diligence on Madoff, BLMIS and CMT;

(d)     Collecting management and performance fees based on inflated Net Asset Values Reports prepared by, or prepared under the supervision of, the Fairfield Entity Defendants; and

(e)     Failing to supervise CITCO and PricewaterhouseCoopers, each of which prepared and delivered to the Fund inaccurate audited financial reports and other financial information.

21

80.     By reason of the foregoing, the Fund is entitled to compensatory damages in an amount to be calculated at trial, but not less than $919,476,832, including the return of all performance and management fees paid dating back to November 1990.

## SECOND CLAIM
### *(Breach of Contract as against the Fairfield Entity Defendants)*

81.     Plaintiff realleges paragraphs 1 through 80.

82.     The Fund entered into certain investment management agreements, all of which provided, *inter alia*, that the Fairfield Entity Defendants shall use their "best efforts" to supervise Madoff, BLMIS and CMT. See November 15, 1990 IMA, ¶ 2; October 1, 2002 IMA ¶ 2; July 1, 2003 IMA, ¶ 2; and October 1, 2004 IMA, ¶ 2.

83.     Pursuant to ¶ 2 of the July 1, 2003 IMA and the October 1, 2004 IMA, the Fairfield Entity Defendants were required to use "*best efforts*" to oversee the Fund's day-to-day investment activities, act as the Fund's investment adviser, provide accurate information to the Fund, and supervise the activities of the Fund's auditors and CITCO.

84.     The SIPA Trustee has found no evidence that the investment advisory arm of BLMIS settled any trade on the account of any customer, including the Fund, and Madoff has admitted that he did not execute a single trade on the account of his investment advisory clients since the early 1990s and that he falsified trade confirmations, account statements and other information provided to clients involved with the "split strike conversion" strategy, such as the Fund.

85.     All information prepared by, or prepared under the supervision of, the Fairfield Entity Defendants concerning the Fund's Net Asset Value was inaccurate.

86.     Given these facts, the Fairfield Entity Defendants did not use "best efforts" in supervising Madoff and carrying out their investment and risk adviser duties under the

22

investment management agreements. The Fairfield Entity Defendants could not have used "best efforts" because -- over the course of 18 years -- Madoff did not place one single legitimate trade on the account of the Fund. The Fairfield Entity Defendants did not perform adequate asset-verification procedures, namely the Fairfield Entity Defendants did not confirm with independent sources whether Madoff was actually trading on the account of the Fund as he purported to be doing through trade tickets and account statements, nor did the Fairfield Entity Defendants inquire with relevant option exchanges, or over-the counter option counterparties, to spot check or confirm that Madoff purchased or sold option contracts on behalf of the Fund.

87.    The Fairfield Entity Defendants' conduct and inaction constitute gross negligence and reckless disregard for their duties as an investment and risk adviser under Sections 2 of the October 1, 2004 IMA, July 1, 2003 IMA, October 1, 2002 IMA, and the November 15, 1990 IMA.

88.    As a result, the exculpatory and indemnification provisions of the October 1, 2002 IMA (§ 9), July 1, 2003 IMA (§10), and the October 1, 2004 IMA (§10) are inapplicable and unenforceable.

89.    By reason of the foregoing, the Fund is entitled to compensatory damages in an amount to be calculated at trial, but not less than $919,476,832, including the return of all performance and management fees paid dating back to November 1990.

### THIRD CLAIM
*(Unjust Enrichment as against all Defendants)*

90.    Plaintiff realleges paragraphs 1 through 89.

91.    From the outset of their relationship, the Fund has paid, and Defendants have received, management and performance fees based on inflated Net Asset Values Reports on the account of the SSC Investments.

23

92.     The Fairfield Entity Defendants had an obligation, as the Fund's investment adviser and risk control agent, to independently verify pricing and positions reflected in the BLMIS and Madoff account statements. The Fairfield Entity Defendants failed to do so. Instead, they simply imported Madoff's false numbers to the Net Asset Value Reports and were paid performance and management fees based on those reports.

93.     As owners, controlling persons and partners of the Fairfield Entity Defendants, each of the Fairfield Controlling Partners Defendants and the Fairfield Partner Defendants received a pro rata share of the management and performance fees that the Fund paid to the Fairfield Entity Defendants derived from the SSC Investments.

94.     Because each of the Defendants received a share of the more than $919 million dollars of fees which the Fund mistakenly paid based on inflated Net Asset Value Reports, Defendants have been unjustly enriched at the Fund's expense and are holding monies, which in good conscience and under principles of equity, should be returned to the Fund.

95.     Defendants should each make restitution with interest to the Fund and must return all management and performance fees based on the Fund's Net Asset Value Reports.

## FOURTH CLAIM
### *(Constructive Trust as against all Defendants)*

96.     Plaintiff realleges paragraphs 1 through 95.

97.     The Fairfield Entity Defendants, the Fairfield Controlling Partner Defendants and Vijayvergiya owed fiduciary obligations and a duty of care to the Fund, and they have been unjustly enriched as a result of receiving management and performance fees based on overstated Net Asset Value Reports.

24

98.     Each of the Fairfield Partner Defendants enjoyed a confidential relation of trust with the Fund, and each has been unjustly enriched by receiving compensation based, in part, on inflated Net Asset Value Reports.

99.     Under agreements and other promises, the Fairfield Entity Defendants represented to the Fund that they would use their best efforts to supervise the activities of Madoff, BLMIS and CMT, and that they would independently verify the underlying information of the Net Asset Value Reports on which management and performance fees were calculated and paid.

100.    Relying on inflated Net Asset Value Reports and other financial reports and information prepared by, or prepared under the supervision of, the Fairfield Entity Defendants, the Fund paid management and performance fees over the past 18 years -- which were then distributed on a pro-rata share to the Fairfield Controlling Partner Defendants and the Fairfield Partner Defendants.  Therefore, Defendants are holding monies, which in good conscience and under principles of equity, should be returned to the Fund.

101.    By reason of the foregoing, the Fund is entitled to a constructive trust imposed on all moneys and other property within the possession, custody or control of each Defendant, including on (a) all management fees received by Defendants, (b) all performance fees received by Defendants, and (c) all assets or compensation received by Defendants in connection with the business of FGG and all of its affiliates.

## FIFTH CLAIM
### (Rescission of the Investment Management Agreements Based on Mutual Mistake)

102.    Plaintiff realleges paragraphs 1 through 101.

103.    The Fund and the Fairfield Entity Defendants entered into the investment management agreements under the material mistaken assumption that the Fund's assets would be

25

invested pursuant to a legitimate "split strike conversion" investment strategy, and they believed that Madoff was a legitimate money manager at the time the investment management agreements were executed.

104.     From the outset of the Fund's relationship with the Fairfield Entity Defendants, the Fund mistakenly paid management and performance fees based on inaccurate Net Asset Value Reports prepared from false BLMIS trade tickets and monthly account statements.

105.     Based on the foregoing, the October 1, 2004 IMA, July 1, 2003 IMA, October 1, 2002 IMA, and the November 15, 1990 IMA should be rescinded and the Fund is entitled to restitution with interest in an amount to be determined at trial, but not less than $919,476,832.

## SIXTH CLAIM
### *(Accounting as against all Defendants)*

106.     Plaintiff realleges paragraphs 1 through 105.

107.     Under Section 2 of the October 1, 2004 IMA, the Fund is entitled to an accounting of all financial information relating to the Fund, including compensation paid to each Defendant. The Fund has requested information as to all fees paid on the account of the SSC Investments. Defendants have refused to provide it.

108.     Moreover, given that the Fund and each Defendant enjoyed a confidential relationship of trust, each Defendant must account for the management and performance fees that they each have received based on the illusory Net Asset Value Reports.

109.     The payment of management and performance fees was not justified and a complete accounting should be ordered.

26

Supreme Court Records OnLine Library - page 31 of 72

## SEVENTH CLAIM
### *(Judgment Declaring That The Fund Does Not Owe Any Amounts to the Defendants)*

110.    Plaintiff realleges paragraphs 1 to 109.

111.    Under the Amended and Restated Deferred Fee Agreement, dated July 1, 2003, and the Second Amended and Restated Deferred Fee Agreement, dated December 31, 2008, between the Fund and FGBL (the "Deferred Fee Agreement"), the Fairfield Entity Defendants elected to defer the payment of certain management and performance fees derived from the SSC Investments (the "Deferred Fees").

112.    As of December 31, 2008, the Fairfield Entity Defendants estimated that the Deferred Fees were approximately $26 million, and they were recorded on the Fund's books as a liability.

113.    By reason of the foregoing, because the Deferred Fees are based on non-existent Net Asset Values, the Fund is entitled to a judgment declaring that (a) the Fund does not owe Deferred Fees to the Fairfield Entity Defendants under the investment management agreements and/or the Deferred Fee Agreement, and (b) the Deferred Fees are an asset of the Fund.

## RELIEF REQUESTED

WHEREFORE, the Fund requests that the Court grant judgment as follows:

(1)    For count one against the Fairfield Entity Defendants, the Fairfield Controlling Partner Defendants and Vijayvergiya, restitution in an amount of no less than $919,476,832 million plus statutory interest, and compensatory damages to be calculated at trial;

(2)    For count two against the Fairfield Entity Defendants, restitution in the amount of no less than $919,476,832 million plus statutory interest, and compensatory damages to be calculated at trial;

27

(3) For count three against all Defendants, restitution in the amount of no less than $919,476,832 million plus statutory interest;

(4) For count four against all Defendants, a constructive trust over all assets, property, and/or cash currently in the custody and control of each Defendant;

(5) For count five against all Defendants, rescission of the October 1, 2004 IMA, July 1, 2003 IMA, October 1, 2002 IMA, and the November 15, 1990 IMA, and restitution in the amount of no less than $919,476,832;

(6) For count six against all Defendants, an accounting of all of the management and performance fees received by each Defendant from the Fund;

(7) For count seven against all Defendants, a judgment declaring that (a) the Fund does not owe any Deferred Fees to any Defendant, and (b) the Deferred Fees are an asset of the Fund; and

(8) Such other, further and different relief as the Court deems just and proper, including costs, and attorneys' fees, and disbursements of this action.

28

Supreme Court Records OnLine Library - page 33 of 72

SEWARD & KISSEL LLP

By: _____
    Michael J. McNamara
    Jack Yoskowitz
    Walter A. Naeder

One Battery Park Plaza
New York, New York 10004
(212) 574-1200

Attorneys for Plaintiff Fairfield Sentry Limited

SK 25528 0043 984355

29

# **VERIFICATION**

STATE OF NEW YORK       )

                              )    ss:

COUNTY OF NEW YORK     )

        JACK YOSKOWITZ, being duly sworn, deposes and says:

1.     I am a member of the law firm of Seward & Kissel LLP, United States counsel for Plaintiff Fairfield Sentry Limited. I make this Verification because Plaintiff is a foreign corporation.

2.     I have read the foregoing Verified Complaint and know its contents. The Verified Complaint is true to the best of my knowledge.

3.     My knowledge and the grounds for my belief as to all matters in the Verified Complaint are derived from my investigation of the facts, which includes a review of Plaintiff's business records, Defendants' business records, pleadings and exhibits filed by government authorities, Bernard L. Madoff's plea allocution, and the findings of Irving Picard, Esq., the court-appointed Bankruptcy Trustee presiding over the liquidation of Bernard L. Madoff Investment Securities LLC.

_____
Jack Yoskowitz

Sworn to before me this
29th day of May 2009

_____
Notary Public

IRA J. ARONSON
Notary Public, State of New York
No. 01AR4732833
Qualified in New York County
Commission Expires September 30, 20 10



## INVESTMENT MANAGEMENT AGREEMENT

Agreement dated as of *November 15,* 1990, between Fairfield
Sentry Limited, a British Virgin Islands corporation (the
"Fund"), having its principal office at Wickams Cay, Box 662,
Road Town, Tortola, British Virgin Islands, and Fairfield
International Managers, Inc., a Delaware corporation (the
"Investment Manager"), having its principal office at 2 Soundview
Drive, Greenwich, Connecticut  06830.

WHEREAS, the Fund wishes to obtain the investment advice and
investment services of the Investment Manager; and

WHEREAS, the Investment Manager is willing to provide such
advice and services on the terms and conditions set forth below,

NOW, THEREFORE, in consideration of the premises and of the
mutual covenants and agreements hereinafter set forth, the
parties hereby agree as follows:

1.    The Fund hereby retains the Investment Manager to
manage the investment of its assets as contemplated by those
certain Subscription Documents of the Fund, including the
Schedules thereto (the "Subscription Documents").  Such
management will include, but shall not be limited to establishing

1

an account on behalf of the Fund with C&M Trading ("CMT") which shall receive an allocation of the Fund's assets for the purpose of trading in equity securities and options on securities. The initial capital in the account will be a minimum of $1,000,000.

2.     The activities engaged in by the Investment Manager on behalf of the Fund shall be subject to the policies and control of the Directors of the Fund. The Investment Manager shall use its best efforts to monitor the performance and activities of CMT.

3.     The Fund acknowledges that an entity known as Fairfield Strategies Limited, an affiliate of the Investment Manager, has maintained an account with CMT since July 1989.

4.     Within 5 days after the end of each week, month or fiscal quarter of the Fund, as the case may be, the Investment Manager shall send to the Fund weekly and monthly valuations of the account with CMT maintained by the Fund. The Investment Manager shall cause any and all documentation respecting such investment to be sent to the Fund. The Investment Manager shall be available at all times, upon reasonable notice, for consultation with the officers and directors of the Fund in connection with the investments of the Fund.

2

5. The Investment Manager shall for all purposes be an independent contractor and not an agent or employee of the Fund, and the Investment Manager shall have no authority to act for, represent, bind or obligate the Fund except as specifically provided herein.

6. All investments of the Fund shall at all times conform to and be in accordance with the requirements imposed by:

(a) any provisions of applicable law; and

(b) provisions of the Certificate of Incorporation, Memorandum of Association, and Articles of Association of the Fund, as amended from time to time.

The Fund shall furnish the Investment Manager with a copy of the Certificate of Incorporation, Memorandum of Association and Articles of Association, of the Fund as in effect at the commencement of this Agreement and, thereafter, shall promptly furnish the Investment Manager with copies of such documents as they may be amended from time to time.

7. The Fund shall pay the Investment Manager, as full compensation for the services performed by the Investment Manager a performance fee, payable quarterly, in an amount equal to 20% of the amount of any New High Net Profits as defined in Schedule

3

Supreme Court Records OnLine Library - page 39 of 72

B to the Subscription Documents (the "Performance Fee").  Payment

of the Performance Fee shall be made on or after the last day of

each calendar quarter of each year.  The net asset value per

share at any time shall be determined by dividing the net assets

of the Fund at such date by the number of shares of Capital Stock

outstanding at such date prior to subscriptions or redemptions at

such date.  Each payment for services to the Investment Manager

shall be accompanied by a report of the Fund, prepared either by

the Fund or by an established firm of independent public

accountants, which shall show the amount properly payable to the

Investment Manager under this Agreement, and the manner of

computation thereof.

     8.    The Investment Manager shall pay any fees assessed by

CMT out of the fees paid to it hereunder.

     9.    The Fund will bear, for each year, all other expenses

incurred in the operation of the Fund, including ordinary and

necessary expenses directly related to its investment and trading

activities, including transactional costs (e.g., brokerage

commissions and interest expense) and escrow and custodial fees,

all registrar, transfer agent and administration fees, and all

legal and auditing fees, including any legal and auditing fees

4

that relate to extraordinary circumstances, such as tax
examinations or litigation involving the Fund or Investment
Manager, but excluding any legal fees incurred in connection with
the continued offering of the Fund's shares.

10. The Investment Manager agrees to advance all of the
Fund's initial organization and offering expenses, which consists
solely of the incorporation of the Fund, which amounts shall be
reimbursed to the Investment Manager out of the proceeds of the
offering of the Fund's shares.

11. The Investment Manager will render the services set
forth in this Agreement at its own expense, including without
limitation, the salaries of employees necessary for such
services, the rent and utilities for the facilities provided, and
other advisory and operating expenses, except as assumed by the
Fund.

12. The Investment Manager shall not be liable for any
error of judgment or for any loss suffered by the Fund in
connection with the subject matter of this Agreement, except loss
·resulting from willful misfeasance, bad faith or gross negligence
in the performance of the Investment Manager's obligations and
duties, or by reason of the Investment Manager's reckless

5

disregard of its obligations and duties hereunder.

13. The Investment Manager and the shareholders, directors, employees or officers of the Investment Manager, who may or may not also be shareholders, directors, employees or officers of the Fund, may engage simultaneously with their investment management activities on behalf of the Fund in other businesses, and may render services similar to those described in this Agreement for other individuals, companies, trusts or persons, and shall not by reason of engaging in such other businesses or rendering of services for others be deemed to be acting in conflict with the interests of the Fund. Shareholders, directors, officers or employees of the Investment Manager, in their individual capacities, may be shareholders, directors, officers or employees of the Fund but shall not be deemed thereby to have interests which are in conflict with the interests of the Fund.

14. It is agreed that the starting equity of the Fund shall not be less than $1,000,000.

15. This Agreement shall be in full force and effect on the date of this Agreement and shall continue in effect thereafter. This Agreement may be terminated on notice ten days prior to the end of any calendar quarter, by the delivery of written notice of

6

Supreme Court Records OnLine Library - page 42 of 72

termination. During the period between the date when notice of termination is deemed given hereunder and the effective date of termination, the rights, powers and duties of the Investment Manager shall remain in full force and effect but shall be subject to the right of the Fund to direct the liquidation of the Account, which direction shall be given in writing or by telex.

16. Any notice required to be given hereunder shall be in writing and shall be sent by registered or certified air mail, postage prepaid, with return receipt requested, or by means of telecopy or other wire transmission (with request for assurance of receipt in a manner typical with respect to communications of that type), to the Fund and Investment Manager at the addresses indicated hereon, or to such other addresses as the parties may hereafter direct in writing. The effective date of any notice given by mail shall be ten days after the date of mailing thereof; any notice to any party having a telecopy or telex number for the receipt at its address for notice hereunder of messages by transmission by telecopy or telex shall be deemed given when transmitted by telecopy or telex addressed to such party at such telecopy or telex number.

17. This Agreement shall be binding upon and inure to the

7

benefit of the parties hereto and their respective successors and assigns, and shall not be modified, except in writing, nor assigned by either party without the consent of the other party.

18.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed as of the day first above written.

FAIRFIELD SENTRY LIMITED

By:   *Fred Kolber*
 _____
 Fred Kolber, President

FAIRFIELD INTERNATIONAL MANAGERS, INC.

By:   *Fred Kolber*
 _____
 Fred Kolber, President

8

Supreme Court Records OnLine Library - page 44 of 72



## AMENDED AND RESTATED INVESTMENT MANAGEMENT AGREEMENT

This Amended and Restated Investment Management Agreement (the Agreement"), dated as of October 1, 2002, which amends and restates the Investment Management Agreement dated as of December 31, 2001 (the "Original Investment Management Agreement"), between Fairfield Sentry Limited, a British Virgin Islands corporation (the "Fund"), having its registered office at Citco B.V.I. Limited, P.O. Box 662, Road Town, Tortola, British Virgin Islands, and Fairfield Greenwich Limited, a corporation organized under the laws of the Cayman Islands (the "Investment Manager"), having an office at c/o Charles, Adams, Ritchie & Duckworth, Second Floor, Zephyr House, P.O. 709, George Town, Grand Cayman, Cayman Islands, British West Indies.

WHEREAS, the Fund and the Investment Manager are parties to the Original Investment Management Agreement; and

WHEREAS, the Fund and the Investment Manager desire to amend and restate the Original Investment Management Agreement in its entirety on the terms and conditions set forth below,

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements hereinafter set forth, the parties hereby agree as follows:

1. The Fund hereby retains the Investment Manager to manage the investment of its assets as contemplated by and described in the Confidential Private Placement Memorandum of the Fund, as amended October 1, 2002, and as such Confidential Private Placement Memorandum may be further amended (the "Memorandum"). Such management will include, but shall not be limited to maintaining the account established in the name of the Fund at Bernard L. Madoff Investment Securities, Inc., a broker dealer registered with the Securities and

9303111.4

Exchange Commission, in New York, New York ("BLM"), for the purpose of trading in equity securities and options on securities, and to investing assets of the Fund in Non-BLM investment vehicles ("Non-BLM Investments").

2. The activities engaged in by the Investment Manager on behalf of the Fund shall be subject to the policies and control of the Fund's Directors. The Investment Manager shall use its best efforts to monitor the activities and performance of BLM and any Non-BLM Investments.

3. Within 5 days after the end of each week, month or fiscal quarter of the Fund, as the case may be, the Investment Manager shall send to the Fund weekly, monthly and quarterly valuations of the account with BLM maintained by the Fund and weekly, monthly and quarterly valuations of any Non-BLM Investments. The Investment Manager shall cause any and all documentation respecting such account to be sent to the Fund. The Investment Manager shall be available at all times, upon reasonable notice, for consultation with the Directors of the Fund in connection with the investments of the Fund.

4. The Investment Manager shall for all purposes be an independent contractor and not an agent or employee of the Fund, and the Investment Manager shall have no authority to act for, represent, bind or obligate the Fund except as specifically provided herein.

5. All investments of the Fund shall at all times conform to and be in accordance with the requirements imposed by:

    (a)    any provisions of applicable law; and

    (b)    provisions of the Certificate of Incorporation, Memorandum of Association, and Articles of Association of the Fund, as amended from time to time.

9303111.4

-2-

Supreme Court Records OnLine Library - page 47 of 72

The Fund shall furnish the Investment Manager with a copy of the Certificate of Incorporation, Memorandum of Association and Articles of Association, of the Fund as in effect at the commencement of this Agreement and, thereafter, shall promptly furnish the Investment Manager with copies of such documents as they may be amended from time to time.

6. The Fund shall bear, for each year, all expenses in maintaining the Fund's offices and all other expenses incurred in the operation of the Fund, including the ordinary and necessary expenses related to the Fund's investment and trading activities (including transactional costs, escrow and custodial fees), all legal and auditing fees, and fees and expenses relating to any extraordinary circumstances, such as tax examinations and litigation involving the Fund; but excluding any legal fees that relate to the continuance of the offering of the Fund's shares.

7. (a) The Fund shall pay the Investment Manager, as full compensation for the services performed by the Investment Manager and the facilities furnished by the Investment Manager a quarterly performance fee (the "Performance Fee"), in an amount equal to 20% of the amount of any New High Net Profits as defined in the Memorandum. Shares of the Fund shall be subject to the payment of the Performance Fee for the portion of each calendar quarter that they are issued and outstanding. For the purposes hereof, the value of the net assets of the Fund and its Net Asset Value per Share (as defined in the Memorandum) shall be computed in the manner specified in the Memorandum for the computation of the value of such net assets in connection with the determination of the redemption price of its shares. Payment of the Performance Fee shall be made to the Investment Manager on or after the last day of each calendar quarter of each year. Each payment to the Investment Manager for services shall be accompanied by a report of the Fund, prepared either by the Fund or by an established firm of

Supreme Court Records OnLine Library - page 48 of 72

independent public accountants, which shall show the amount properly payable to the Investment Manager under this Agreement, and the manner of computation thereof. The Investment Manager and the Fund may supplement this Agreement at any time to provide for the deferred payment of all or any portion of the fees to be paid to the Investment Manager pursuant to this Agreement.

(b) Notwithstanding the foregoing, in the event that, as at the end of any calendar year, the aggregate amount invested by the Fund in Non-BLM Investments held by the Fund at any time during such year exceeds the aggregate net asset value of the Fund's interests in such Non-BLM Investments at year end and the net amounts realized during the year of such Non-BLM Investments (before reducing the aggregate net asset value of the Fund's interests at year end in such Non-BLM Investments by the Fund's share of fees payable to the portfolio managers of such Non-BLM Investment) (such excess being the "Non-BLM Investment Loss"), the Investment Manager will offset and reduce its Performance Fee payable at such year end and any subsequent quarter end by an amount equal to such Non-BLM Investment Loss. The portion of the Performance Fee that is offset and reduced by the Non-BLM Investment Loss nonetheless will be paid to the Investment Manager by the Fund in the event that the Non-BLM Investment Loss is, in part or in whole, subsequently recouped by the same or other through the performance of Non-BLM Investments.

8. The Investment Manager will render the services set forth in this Agreement at its own expense, including without limitation, the salaries of employees necessary for such services, the rent and utilities for the facilities provided, and other advisory and operating expenses, except as assumed by the Fund in paragraph 6, above; provided, however, that the Fund shall pay the Investment Manager an amount equal to one-fortieth of one percent (0.025%)

9303111.4

-4-

Supreme Court Records OnLine Library - page 49 of 72